**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**FRANCISCO J MOLINA,**

               **Plaintiff,**

     **vs.**

**STATE OF NEW YORK; NYS OFFICE OF
CHILDREN AND FAMILY SERVICES;
NYS DIVISION FOR YOUTH; LOUIS GOSSETT
JR. RESIDENTIAL CENTER; JOHN A
JOHNSON, Commissioner of the NYS Division for
Youth; JOSEPH IMPICCIATORE, Director of the
Louis Gossett Jr. Residential Center; CYRIL
STEPHENS, Youth Detention Aide at the Louis
Gossett Jr. Residential Center; ARTHUR MYERS,
Youth Detention Aide at the Louis Gossett Jr.
Residential Center; SCOTT PELKY, Youth
Detention Aide at the Louis Gossett Jr. Residential
Center; and "JOHN and JANE DOES," the names
being fictitious and intended to be the individual(s)
who is/was/were employed at the Louis Gossett Jr.
Residential Center and who caused injury to the
Plaintiff,**

               **Defendants.**
_____

             **1:09-CV-00467
(MAD/ATB)**

**APPEARANCES:**

PEKNIC, PEKNIC & SCHAEFER
1005 West Beech Street
Long Beach, New York 11561
_Attorneys for Plaintiff_

ERIC T. SCHNEIDERMAN
ATTORNEY GENERAL OF THE STATE
OF NEW YORK
The Capitol
Albany, New York 12224
_Attorneys for Defendants_

**OF COUNSEL:**

Sean W. Schaefer, Esq.

Adrienne J. Kerwin, Esq.
Assistant Attorney General

**Mae A. D'Agostino, U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.    INTRODUCTION

Plaintiff Francisco Molina, brought this action for relief under 42 U.S.C.§ 1983 alleging that defendants Cyril Stephens ("Stephens") and Arthur Myers ("Myers") used excessive force against him in violation of his Eighth Amendment rights.[1]  Presently before the Court is defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Dkt. No. 37).  Plaintiff has opposed the motion.  (Dkt. No. 41).

## II.   FACTS[2]

At the time of the incident, plaintiff was 17 years old and a resident of the Louis Gossett, Jr. Residential Center ("Gossett Center") in the custody of the State of New York Office of Children and Family Services ("OCFS").  Defendant Stephens was the Administrator on Duty and was responsible for all staff and all units at the Gossett Center.  Defendant Myers was a Level Three Youth Detention Aide ("YDA") responsible for the direct care of the residents.

Incident

On December 4, 2006, plaintiff was in the gymnasium at the Gossett Center.  Plaintiff, who was prohibited from taking part in gym activities because he was on arm's length supervision,[3] began doing push-ups and was directed to stop by a YDA.[4]  Plaintiff continued to do

---

[1] On March 3, 2010, United States District Judge Lawrence E. Kahn issued a Memorandum-Decision and Order on defendants' motion to dismiss.  As a result of that decision and a subsequent stipulation of the parties, the only remaining cause of action is plaintiff's Eighth Amendment claim against Stephens and Myers.

[2] There are few undisputed facts.  The background set forth in this section is taken from the exhibits and evidence submitted by defendants in support of the Motion for Summary Judgment and the exhibits and evidence submitted by plaintiff in opposition to the Motion for Summary Judgment. To the extent that the parties' Statements of Material Facts are supported by the record, the Court will also consider those submissions in the context of the within motion.  The facts recited are for the relevant time period as referenced in the complaint.

[3] Plaintiff understood arm's length supervision to mean that he was not allowed to leave the officer's side.

[4] The YDA was Ms. Titus.  Ms. Titus is not a defendant herein.

2

push-ups resulting in the YDA, "pushing the pin".[5]   After Titus alerted the response team, Titus

and Scott Pelky ("Pelky"), plaintiff's block officer, escorted plaintiff out of the gymnasium.

Plaintiff claims that he walked freely and was not arguing with the officers.  As a result of the pin

push, a response team, including defendants Stephens and Myers, arrived at the corridor outside

the gymnasium.  Stephens arrived first and claims that plaintiff's back was against a wall.

Stephens claims that he heard plaintiff cursing at the YDA and being "nasty and disrespectful",

but not physically acting out.  Stephens claims that he stood six to seven inches from plaintiff and

told plaintiff to calm down and be respectful.  Plaintiff alleges that Stephens was screaming at

him.  Myers arrived and saw Stephens attempting to "de-escalate" the situation.  Stephens and

Myers claim that plaintiff became "aggressive" and took a step towards Stephens with balled fists

and attempted to grab him.  At that point, Stephens spun plaintiff around and attempted to initiate

a physical restraint technique and place plaintiff in a single-man restraint tactic known as "high

hooks".[6]   Stephens claims that as he attempted this maneuver, he was "struggling with the kid"

but also testified that plaintiff, "wasn't kicking and flailing like that, he was just tugging with me

up on top".  Myers testified that plaintiff was "resisting" and, "thrashing back and forth, trying to

snatch his arms away.  You know, grabbing pants and clothes and things of that nature".  Plaintiff

claims he was not using his feet or trying to get away.  Stephens claims he, "got [plaintiff] on the

ground as quickly as possible".  Myers testified that Stephens and plaintiff fell to the floor but

that the fall was not "hard", rather, they didn't "transition the way I know a restraint's supposed

to transition".  Plaintiff claims that he was "thrown" to the ground.

---

[5] The pin sends a radio signal to a response team.

[6] Plaintiff describes the restraint as a "choke hold".  According to Stephens, in order to engage the restraint, the officer gets behind the individual and hooks his arm under both of the individuals armpits and then drops to one knee and rolls the individual onto his stomach.

Once on the floor, Stephens and plaintiff remained on the floor for fifteen to twenty seconds.  Myers and Stephens testified that Myers offered to take over the "primary position" because Stephens was struggling to control plaintiff.  Stephens also testified that he became "winded" and had to be accessible if another pin was pulled.  Stephens transferred one of plaintiff's arms, and then the other, to Myers who then placed plaintiff in high hooks.  During this transition, plaintiff claims he was yelling for the officers to get off of him and let him go.  The transition from Stephens to Myers took approximately ten seconds.  At that time, Myers testified that plaintiff's head was towards the middle of Myers' lower back, in his groin area.  Myers claims he, "wasn't in the proper technique at that point.  He was still resisting.  He wasn't secure yet".  Stephens claims that plaintiff was attempting to "grab Myers' testicles".  Within seconds of Myers' taking over the hold, the parties heard a "pop".  Myers released plaintiff's arm.[7]

Plaintiff suffered a fracture to his right arm.  Plaintiff was taken to Cayuga Hospital where x-rays were taken, his arm was casted and placed in a sling.  Plaintiff returned to the Gossett Center later that same evening. The next morning, plaintiff returned to Cayuga Hospital and was admitted for three days.  Plaintiff was discharged and returned to the Gossett Center.

Grievance Procedure and Investigation

OCFS provides a grievance procedure available to any resident wishing to formally complain about any aspect of their residency in an OCFS facility, including circumstances of a physical restraint.  As an exhibit in support of the within motion, defendants provide The New York State Office of Children and Family Services Resident Manual for Non-Secure Facilities ("Manual").  The Manual provides:

TABLE OF CONTENTS

---

[7] Plaintiff testified that five to eight seconds elapsed between hearing the "pop" and Myers' release.

RESIDENT GRIEVANCE PROGRAM
    Reception Center Grievance Process
    The OCFS Ombudsman

Under the title, Resident Grievance Program, the Manual provides, in relevant part:

Resident grievance forms are located on each living unit and in an area of the facility generally used by residents.

To file a grievance, you fill out a grievance form and put the completed form directly into a locked grievance mailbox.

After your grievance has been date stamped and given a log number, a copy of the grievance will be given to you and the unit administrator.

Within 7 days from the date stamped on your filed and logged grievance, you will receive a written decision on your grievance.

Under the title, The OCFS Ombudsman, the Manual provides:

An OCFS ombudsman is a lawyer who specializes in juvenile law and the legal rights of young people.  The ombudsman helps you with your legal problems or questions.  The Office of the Ombudsman is part of the Commissioner's Office.

The Ombudsman hears concerns regarding the treatment of residents in the OCFS facilities.  The ombudsman will also look into any complaint believed to be a violation of your legal rights.   The ombudsman will also try to assist you with legal problems you may have which are unrelated to the facility.  If you need the help of a judge, a lawyer, or community service worker to solve your problem, the ombudsman can assist you in contacting that person.

You may tell your concerns to the counselor assigned to your unit or to any other employee.

If you feel your concerns are not being addressed, you may fill out a Resident Grievance Form (See section on Resident Grievance Program to find out how to file a grievance).

Every OCFS facility employee is required to report suspected cases of abuse or maltreatment to the New York State Child Abuse Hotline.  If a facility employee suspects that you have been abused or maltreated, the employee must see to it that a report is made to the hotline for investigation.

*See* Kerwin Aff., Ex. "D" at pps. 3-6.

Plaintiff claims that a few days after he was released from the hospital, he returned to the Gossett Center and filed a grievance form complaining that Stephens and Myers used excessive force.  Plaintiff claims he, "filled it out and put it in the box, a little grievance box".  Defendants claim that a search of the Grievance Log and all other relevant records failed to uncover any grievance filed by plaintiff in connection with the December 4, 2006 incident.

On December 18, 2006, plaintiff was interviewed by Annabelle Gardner, a Child Abuse Specialist employed by the OCFS Syracuse Regional Office.[8] Ms. Gardner states that she conducted an investigation into a report of possible child abuse made to the New York Statewide Central Register of Child Abuse and Maltreatment hotline on December 4, 2006 regarding an injury plaintiff received at the Gossett Center.  Ms. Gardner interviewed witnesses, including plaintiff.  Ms. Gardner prepared a report of her investigation and concluded that the accusation of possible child abuse was unfounded.   The report, which lists the date of intake as December 5, 2006, indicates that, "[w]hile on another investigation at Louis Gossett Jr. Residential Center, this investigator was informed by Mr. Germano of this SCR report".

In "December 2006", Scot Lamphier, a Level 2 Youth Counselor employed by the OCFS at the Gossett Center and Assistant Director Ernie Germano conducted an internal investigation of the December 4, 2006 incident.[9]  As part of the investigation, Mr. Lamphier interviewed witnesses, including plaintiff, defendants, Pelky, Titus and other Gossett employees including other YDA's in the gymnasium on the day of the incident.  Annexed to Mr. Lamphier's affidavit

---

[8] Ms. Gardner prepared an affidavit submitted in support of defendant's motion.

[9] In support of the within motion, Mr. Lamphier provided an affidavit.

is a "Narrative" that contains "Findings" that the force used by Stephens and Myers was not excessive.[10]

## III.   DISCUSSION

### A.   Summary Judgment Standard

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 258 (1986). A party moving for summary judgment bears the initial burden of demonstrating that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the Court, viewing the evidence in the light most favorable to the nonmovant, determines that the movant has satisfied this burden, the burden then shifts to the nonmovant to adduce evidence establishing the existence of a disputed issue of material fact requiring a trial. *See id.* If the nonmovant fails to carry this burden, summary judgment is appropriate. *See id.*

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and

---

[10]  Annexed to Mr. Lamphier's affidavit is a report entitled "Investigation #06-99FC, OCFS #1597-06 Narrative". The report is unsigned and undated.

resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *Chertkova v. Conn. Gen 'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996) (citing Fed. R. Civ. P. 56(c)).

**B.    Failure to Exhaust**

Under the Prison Litigation Reform Act ("PLRA"), an inmate must exhaust all available administrative remedies prior to bringing a § 1983 action "with respect to prison conditions." *See* 42 U.S.C. § 1997e(a); *see also Porter v. Nussle*, 534 U.S. 516, 523-24 (2002) (discussing § 1997e(a) exhaustion requirements). "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 200 (2007) (citation omitted). In light of this exhaustion requirement, a federal court must dismiss a § 1983 complaint brought by an inmate where the prisoner failed to exhaust his administrative remedies absent "justification for not pursuing [such] remedies." *Giano v. Goord*, 380 F.3d 670, 675 (2d Cir. 2004) (citations omitted). As a juvenile in a resident facility, plaintiff is obligated to exhaust his administrative remedies per the PLRA. *Lewis ex rel. Lewis v. Gagne*, 281 F.Supp.2d 429, 433 (N.D.N.Y. 2003).

The Second Circuit has crafted a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted for failure to satisfy the PLRA's exhaustion requirement. *McQueen v. County of Albany*, 2010 WL 338081, at *7 (N.D.N.Y. 2010) (citing *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004)). First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill*, 380 F.3d at 686 (citation omitted). The age of the prisoner and their familiarity with the grievance procedure are relevant in determining whether the grievance process was available to the prisoner. *Lewis v. Mollette*, 752 F.Supp.2d 233, 241 (N.D.N.Y.

2010) (citations omitted).  Second, if those remedies were available, "the court should . . . inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it . . . or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id*.  Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id*.

To determine whether "special circumstances" exist, a court must consider the "circumstances which might lead usually uncounselled prisoners to fail to grieve in the normally required way". *Hill v. Tisch*, 2009 WL 3698380, at *6 (E.D.N.Y. 2009) (citing *Giano*, 380 F.3d at 678).  Findings of special circumstances have primarily been established where a plaintiff acted pursuant to a reasonable interpretation of the regulations. *Winston v. Woodward*, 2008 WL 2263191, at *10 (S.D.N.Y. 2008).  Special circumstances do not exist where plaintiff fails to allege that, during the time in question, he was laboring under any sort of physical infirmity, or reasonable misunderstanding of the law, which impeded his attempts to complain. *McCloud v. Tureglio*, 2008 WL 1772305, at *14 (N.D.N.Y. 2008).  The Second Circuit has recognized that remedies may sometimes be exhausted through the use of informal channels such as contacting the OCFS ombudsman with complaints or reporting suspected cases of abuse to the New York State Child Abuse Hotline. *Lewis v. Mollette*, 752 F.Supp.2d at 240 (it is reasonable for a plaintiff to believe that an Internal Abuse Bureau investigation, started several days after an incident occurred, obviated the need to file a formal grievance or take any other steps).

9

This matter presents facts and issues strikingly similar to those presented in *Lewis ex rel. Lewis v. Gange*, 281 F.Supp.2d 429, 436 (N.D.N.Y. 2003). In *Lewis*, the plaintiff brought a claim for excessive force and deliberate indifference against the Tryon Residential Facility. *Id.* at 431. The defendants moved for summary judgment arguing that the plaintiff failed to exhaust his administrative remedies. *Id.* The plaintiff claimed that he filled out a grievance form and complained to his Youth Division Counselor and YDA. *Id.* at 431. The plaintiff's mother also reported the incident to a senior counselor at the facility and to the New York State Child Abuse and Maltreatment Center. *Lewis*, 281 F.Supp.2d at 431. The Court held that the plaintiff did not exhaust his remedies through formal procedures as he failed to place a grievance in the designated mailbox and failed to file an appeal after not receiving a response within the applicable time period. *Id.* at 433. However, the Court found that the plaintiff informally exhausted his remedies. First, the Court found that the facility's formal grievance program was not the exclusive means of exhaustion. Specifically, the Court reviewed the OCFS handbook and noted that the document, "impl[ies] that the grievance procedure is not the exclusive means for addressing legal issues regarding the facility's treatment of residents." *Id.* at 434. The Court cited to the Handbook noting that, "the grievance program is presented within the context of the other steps a resident may take to assert their legal rights". The Court noted:

> the Handbook, after explaining how to contact the OCFS ombudsman, lists the following as ways a resident can make his or her concerns known about the way he or she is treated:
>
> You may tell your concerns to the Counselor assigned to your unit or to any other employee.
>
> If you feel your concerns are not being addressed, you may fill out a Resident Grievance Form. (See section on Resident Grievance Program to find out how to file a grievance.)

> Every OCFS facility employee is required to report suspected cases of abuse or maltreatment to the New York State Child Abuse Hotline. If a facility employee suspects that you have been abused or maltreated, the employee must see to it that a report is made to the Hotline for investigation.

*Lewis*, 281 F.Supp.2d at 434.  The Court found that the Handbook did not list the order for the options nor did it indicate which procedure should be exercised first.  *Id*.

The Court also found that the facility's own actions demonstrated that the formal grievance procedure need not always be followed to address a problem and prompt an investigation.  *Id*.  Specifically, the facility conducted an internal investigation including an interview of plaintiff within 5 weeks of the incident.  Clearly, the facility knew that the plaintiff was pursuing the matter.  *Id*.  The Court held, "[w]hile not the preferred or most efficient channels of seeking administrative redress, plaintiffs' informal efforts demonstrate a reasonable attempt to exhaust all possible means before filing in federal court".  *Id*. (citations omitted).  As an investigation into the incident ensued, it was reasonable for the plaintiffs believe that at least one effort they took accomplished the same result that filing through the formal process would have produced.  *Lewis*, 281 F.Supp.2d at 434.

In this matter, the OCFS Manual utilized by Gossett includes the same list of services, explaining how to file a grievance and how contact the OCFS ombudsman, as those contained in Tryon Residential Facility's Handbook as discussed in the *Lewis* case.  Moreover, as in *Lewis*, the Gossett Center Manual presents the OCFS Ombudsman information under the same heading and in the same context as the Grievance Procedure.  Indeed, the Manual contains identical language regarding how to report complaints to the Counselor.  Accordingly, this Court adopts the reasoning and holding of the Court in *Lewis* and finds that Gossett's formal grievance procedure

was not the exclusive means of exhaustion.  Moreover, the Handbook did not list the order in which the options were to be undertaken.

Further, as in *Lewis*, plaintiff herein sufficiently exhausted his remedies through informal procedures.  Ms. Gardner's report indicates that her office was first informed of the incident on December 4th or 5th.  On December 18, 2006, two weeks after the incident, Ms. Gardner interviewed plaintiff.  In February and March 2007, Ms. Gardner continued her investigation interviewing Titus, Stephens and the OCFS Medical Director.  Plaintiff testified that he filled out a grievance after he returned to Gossett from the hospital.  He testified that he placed the form in "a little grievance box".  Plaintiff testified as follows:

> A.    I believe about a day - - it's like a week in a half or two weeks after the whole thing happened with my arm, some lady came to me from - - I don't even know.  She told me she was like a human - - what was it - - I don't know.  She was from some organization, or something like that, I gues for cases for all that type of abuse and all that kind of stuff.

> Q.    Like Child Protective or something like that?

> A.    Something like Social Services, stuff like that, but I'm not sure of the names that she gave me.  So then she came and said, "I'm here to talk to you about what happened with you arm".  So, I'm like, "All right."  And she asked me, "Do you feel that they abused you physically?"   And I said, "Yeah".  I gave her a rundown of what happened.  I spoke with her and she said something, that she was going to do something with that complaint and she would get back to me.

> Q.    So does she know about this grievance that you were on?

> A.    No.  I - -

> Q.    You think there were two separate things.  She came in to talk to you - -

> A.    Yes, she came on her own.  I tried to tell them that she came on her own.  They - - I guess, they seen it on the file, they know, know when something like that happens in jail.  So, she

12

came on her own.  But the grievance, I put the grievance in the grievance box on my own, and they never - - they never got back to me.

*          *          *

Q.      Did you ever ask anyone, "What's going on with my grievance?"

A.      Not really because after I spoke to the lady, maybe it was because of the time, because I went home December 31st, so maybe it was after I wrote that grievance.  You know, the lady came and spoke to me and let me know that you're going home.  I said, "I'm going home, that's great."  Basically I was worried about - - focusing on home.  Cleared my mind about that.  So maybe the time frame, because I'm going home, they didn't get back to me.  I waited, if I'm not mistaken, the grievance time, seven days to 14 days for them to come speak to you, and then they came - - I mean one of them.

Based upon the record and the *Lewis* holding, the Court finds that it was reasonable for plaintiff to believe that he did not need to take any further action due to Ms. Gardner's investigation.

Finally, Gossett's own actions and investigations establish that a formal grievance was not necessary. Two reports were prepared regarding the incident and while Gossett and OCFS completed their investigations and found the reports of abuse unfounded, defendants clearly knew that plaintiff was pursuing a claim regarding excessive force.  As in *Lewis*, "defendants were afforded and took advantage of an opportunity to address" plaintiff's claims.  *See Lewis*, 281 F.Supp.2d at 436.  Accordingly, defendants' motion for summary judgment and dismissal of plaintiff's complaint for failure to exhaust administrative remedies is denied.

## C.      Excessive Force

In the alternative, defendants argue that even if plaintiff's claims were not subject to dismissal for failure to exhaust, defendants are entitled to summary judgment because no

13

reasonable fact finder could conclude that plaintiff suffered from a deprivation or violation of his constitutional rights.

When prison officials are "accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992). Claims that prison officials applied restraints too tightly are analyzed under the Eighth Amendment as claims of excessive force. *See Davidson v. Flynn*, 32 F.3d 27 (2d Cir.1994). The extent of any injury suffered by the inmate "is one factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Hudson*, 503 U.S. at 7 (citation and quotation marks omitted).

> In determining whether the use of force was wanton and unnecessary, it may also be proper to evaluate the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by responsible officials, and any efforts made to temper the severity of a forceful response. The absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it.

*Id*. (citation and quotation marks omitted). In other words, not "every malevolent touch by a prison guard gives rise to a federal cause of action. The Eighth Amendment's prohibition of cruel and usual punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Id*. at 9.

An Eighth Amendment claim of cruel and unusual punishment has two components, one subjective and one objective. *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009). The objective

component focuses on the harm done, and the defendants' conduct must be " 'inconsistent with the contemporary standards of decency' and 'repugnant to the conscience of mankind.' " *Whitely v. Albers*, 475 U.S. 312, 327 (1986).  The court must ask itself whether the alleged conduct was objectively "harmful enough to establish a constitutional violation." *Wright*, 554 F.3d at 268 (quoting *Hudson*, 503 U.S. at 8) (internal quotation marks omitted).  Here, defendant admits that plaintiff has satisfied the objective prong of the test.

The subjective component focuses on the motive for the defendants' conduct, and requires a showing that the defendant had the necessary "level of culpability," shown by actions that exhibit "wantonness" in light of the particular circumstances surrounding the challenged conduct. *Id*. (citing *inter alia Hudson*, 503 U.S. at 7-8). The determination of whether action is "wanton" turns upon whether the force "was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson*, 503 U.S. at 7; *Whitely*, 475 U.S. at 320-21 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973), *cert. denied*, 414 U.S. 1033 (1973)).  Thus, where a prisoner's claims, together with his evidentiary proffers could "reasonably, if credited, allow a rational fact finder to find that corrections officers used force maliciously and sadistically," then summary dismissal is not appropriate.  *Wright,* 554 F.3d at 269 (emphasizing that the prohibition against cruel and unusual punishment does not extend to *de minimis* uses of physical force, provided that the use of force is not "repugnant to the conscience of mankind").

In this regard, the Court finds this matter striking similar to another Northern District case, *Lewis v. Mollette*, 752 F.Supp.2d 233 (N.D.N.Y. 2010).  In *Mollette*,[11] the plaintiff, a 15 year old inmate at the Highland OCFS, asserted excessive force claims against employees of the OCFS

---

[11] To avoid confusion, the Court will refer to the *Lewis v. Mollette* matter as "*Mollette*"

after his arm was fractured.  After a disagreement regarding lockers and school materials, the

defendant Mollette initiated a Physical Restraint Technique ("PRT") attempting to restrain the

plaintiff's arms while pulling down to the floor.  *Id*. at 236.  The defendant Keller took the

secondary position and attempted to restrain the plaintiff's legs and then defendant Bahret

replaced Keller in the secondary position.  *Id*.  The defendant Gavin arrived and attempted to

secure the primary position but had difficulty because the plaintiff continued to twist and resist.

*Id*. at 237.  Gavin testified that he was involved in the PRT for less than thirty seconds.  *Mollette*,

752 F.Supp.2d at 236.  The plaintiff claims that while he was laying on the floor, crying and fully

restrained, Gavin took his left arm from Mollette, who already had control of it, and twisted the

plaintiff's arm.  *Id*.  The plaintiff "felt a snap" and his fingers went numb.  Id.  The plaintiff was

released from the PRT.  *Id*.  The following morning, the plaintiff was taken to the hospital and

was diagnosed with a fracture in his left arm.  *Id*.

    The defendants moved for summary judgment arguing that their actions were an exercise

of standard procedure and were done in good faith to restore order.  *Mollette*, 752 F.Supp.2d at

241.  The record contained two different versions of the event prompting the Court to comment

that, "[the] defendants' motion utterly ignores the material facts in dispute"  *Id*. at 242.  As to the

events leading up to the incident, Mollette claimed that the plaintiff threw his body or some object

into a cabinet.  *Id*.  Bahret could not testify regarding the plaintiff's actions prior to the initiation

of the PRT because he arrived after the restraint was in place.  *Id*.  Similarly, Gavin testified that

when he arrived both Mollette and Bahret were already using the restraint.  *Mollette*, 752

F.Supp.2d at 242.  Keller, who assisted Molette in the initial use of the restraint, testified that the

plaintiff, "became out of control" but he could not recall why.  *Id*.  The defendants claimed that

they had difficulty because the plaintiff resisted while the plaintiff argued that Mollette and

Bahret had him under control.  *Id*.   Gavin claimed that the plaintiff's left arm was free and he was swinging, cursing and twisting the entire time.  *Id*.  The plaintiff testified that when Gavin arrived, Mollette had full control of him so there was no need for Gavin to assist.  *Mollette*, 752 F.Supp.2d at 242.

The Court outlined all of the conflicting versions of events and held,

> Considering the facts in the light most favorable to plaintiff as must be done, there was no reason for Mollette to institute the PRT regardless of whether it was an approved type of restraint. According to plaintiff, he was walking back from his locker when, unprovoked and without reason, he was tackled by Mollette. Under these facts, Mollette had no reason and was not authorized to initiate the PRT pursuant to the CMPR Manual. Thus any force used by himself and later, Gavin, was excessive. Furthermore, Mollette had Lewis fully under control by the time Gavin arrived on the scene and thus Gavin's involvement in the PRT was not the exercise of standard procedure in a good faith effort to restore order—because order was allegedly already restored. Because there is evidence from which a reasonable jury could find that defendants used excessive force, their motion for summary judgment on this claim will be denied.

*Id*. at 243.

Here, plaintiff claims that he was complying with Titus' directives when Stephens and Myers arrived and that he was calm.   Plaintiff testified that when he left the gymnasium with Pelky and the YDA, he was not arguing with them.  He testified that when Stephens arrived, he "started screaming at me" and that Stephens was "three inches in [his] face".  Then, plaintiff claims, "[h]e screamed at me some more and then he turned me around.  When he turned me around, Steve - - Stephenson put me in a choke hold.  So when he had me like that against the wall (indicating), I was trying - - I was trying get him off of me, telling him to get off of me".  Plaintiff testified:

> Q.    And what were you doing when he was doing this choke hold?

A.      Trying to talk, trying to tell him get off of me, because I was like pulling, pulling a little bit against my neck, and that's when I reached up.  I'm trying - - I'm trying to like breathe. I'm trying to get space to breathe, and that's when they opened my arms, put them behind my back.  Stephenson grabbed my arm put them behind my back.

\*          \*          \*

Q.      Okay.  Were you doing anything to your feet, trying to get away, use your feet, your body to get away?

A.      I really couldn't.  I was focusing on trying to breathe.  I was just - - that was all I was worried about really.

Plaintiff testified that Stephens hooked his arms behind his back and threw him to the floor.  He testified that Stephens asked Myers to switch with him:

A.      . . . So Myers dropped down on top of me.  I'm trying to tell him, "Yo, Myers, yo, let me go".  And then when I told him to let me go, he pulled up tighter.  And that's when I - - I don't know if I felt it or I heard it, but it was a pop.  I know it was a pop.

Plaintiff testified that while he was on the ground, he was not "moving [his] body, thrashing or anything like that".  After he heard or felt the pop, plaintiff testified that five to eight seconds elapsed.

Defendants argue that Stephens placed plaintiff in a restraint in a good faith effort to restore discipline and that the injury was accidental without any malice.  Stephens testified that when he arrived, plaintiff was outside the gym with his back against the wall with, "fists clenched up to his side", cursing and "giving Titus crap".  Stephens stated that plaintiff was not acting out on her, just being "nasty and disrespectful".  Stephens claims that he told plaintiff to calm down and that he asked him what happened.  Stephens testified:

A.      . . . He came off the wall after me.

Q.      What do you mean he came after you?

18

> A.   Well, he got very aggressive.  He came to me, he stepped to me in an aggressive manner.  His fists were balled.  Before I came to him, he said, don't come near me.  You know, don't come.  I'm not hearing this bullshit.  So you know, I can't have that.  I mean, he's got to do the program.  He can't stand out there and do that.  So, as I'm coming forward, he comes off the wall, comes after me.  That's when I had to spin him real quick and get him down.

Stephens testified that plaintiff grabbed him.  Stephens then put plaintiff in a PRT - physical restraint technique - called high-hooks and got plaintiff to the floor.  Stephens conceded that plaintiff "wasn't kicking and flailing like that.  He was just tugging with me up on top" but testified that he was "struggling with the kid".  Stephens testified about the transfer to Myers:

> A.   So, we get the arm, the right arm right here.  He gets his arm right underneath the pit, and this part is still flailing.  This is where the problem was, because as we were trying to get the arm, Arthur's arm to get right here so we can have this part, we've only go right here (indicating), Francisco was pulling.  He was pulling, and we were trying to get the arm back, and the child's arm just - - we just heard something pop.

At the time they heard "pop", the transfer was not complete.  Stephens also claims that plaintiff was attempting to "grab at Mr. Myer's testicles", "grabbing, scratching his belly, pulling on his clothes".  According to Stephens, plaintiff did not want cuffs to be put on him.

Myers testified that when he arrived at the scene, Stephens was attempting to de-escalate the situation and was talking to plaintiff.  Myers testified that plaintiff was aggressive towards Stephens and he allegedly observed Stephens attempt to turn plaintiff and place him in "the hooks" .  Myers stated that plaintiff "started to resist", and he was, "[j]ust trashing back and forth, trying to snatch his arms away.  You know, he was grabbing pants and clothes and things of that nature".  Myers described the "takedown":

> A.   I'm not sure if the takedown was caused by Mr. Stephens or by Francisco.  It was kind of like they were all over the place.  Francisco was resisting and bending over and doing whatever

19

> he could do to get his arms away from Mr. Stephens.  So, I
> don't know if Mr. Stephens actually took him to the floor or
> that movement transitioned them to the floor.

Myers testified that when he tried to take over the hold, plaintiff was "all over the place. He's just elbowing and pulling his arm and trying to get away and trying to resist the restraint". Myers could not get a proper technique because plaintiff was resisting.  At the time plaintiff's arm broke, Myers was "adjusting from - - he was sort of pulling his arm out of the hook.  He was almost getting away from my grip, almost slipping out.  So , I shifted my body just a little bit to secure him is when I felt his arm pop".  Myers testified that he was on the floor with plaintiff "struggling" for "seconds" before plaintiff's arm broke.

The record establishes that Pelky and Titus (and perhaps other Gossett employees and residents) were present during the incident, both before and after the PRT was initiated. However, the record does not include any statements or deposition testimony from any alleged witnesses to the incident.  The record consists solely of the parties' varying versions of the events leading up to and during the maneuver.  Viewing the evidence in a light most favorable to plaintiff, there is clearly an issue of fact as to whether it was necessary for Stephens to initiate the restraint.  Based upon the parties conflicting versions of the events, there are triable issues regarding the subjective issue of the excessive force claim, i.e., the question of whether defendants' restraint was "a good faith effort to maintain discipline or maliciously and sadistically for the very purpose of causing harm." *Kee v. Hasty*,  2004 WL 807071, at *17 (S.D.N.Y. 2004); *see also Jackson v. Johnson*, 118 F.Supp.2d 278, 289 (N.D.N.Y. 2000) ( the court denied the defendants' motion for summary judgment and dismissal of excessive force claim noting, "issues of fact exist concerning the need for physical force, the amount of force used under the circumstances, and each defendants' role in the application of PRT's").  On a motion for

summary judgment, the Court will not weigh the parties' credibility as that matter is for the jury. *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). Accordingly, defendants' motion for summary judgment and dismissal of plaintiff's excessive force claim is denied.

**D.  Failure to Intervene**

Defendants argue that based upon how quickly the events occurred, neither defendant had a reasonable opportunity to intervene in the use of force by the other. Plaintiff has not responded to this argument.

A corrections worker who, while not participating in an assault upon an inmate, is present while it occurs may nonetheless bear responsibility for any resulting constitutional deprivation. It is well-established that a law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated in his presence by other officers. *See Mowry v. Noone*, 2004 WL 2202645, at *4 (W.D.N.Y. 2004); *see also Curley v. Vill. of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001) ("Failure to intercede results in [section 1983] liability where an officer observes excessive force being used or has reason to know that it will be.") (citations omitted). In order to establish liability on the part of a defendant under this theory, a plaintiff must prove the use of excessive force by someone other than the individual, and that the defendant under consideration: (1) possessed actual knowledge of the use by another corrections officer of excessive force; (2) had a realistic opportunity to intervene and prevent the harm from occurring; and (3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force. *See id.*; *see also Espada v. Schneider*, 522 F.Supp.2d 544, 555 (S.D.N.Y. 2007). Courts have found that, where officers assault an individual so quickly that a fellow officer does not have a realistic opportunity to intercede, the witness officer is not liable for the excessive force. *Phillips v. Roy*, 2011 WL 3847265, at *6

21

(N.D.N.Y. 2011) (citations omitted).  For liability to attach to that, "there must have been a realistic opportunity to intervene to prevent the harm from occurring," and assessment of the existence of such a "realistic opportunity" for intervention and prevention is left to the factfinder's determination. *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir.1994).

Again, the Court relies upon the reasoning of the Court in *Lewis v. Mollette*.  There, the plaintiff claimed that Mollette was standing directly next to Gavin and permitted Gavin to take the plaintiff's left arm and thus, could have reasonably prevented the harm from occurring.  The court held that based upon the facts, a jury could conclude that Mollette was standing close enough to intervene and failed to intervene or stop Gavin from twisting the plaintiff's left arm. Similarly, a jury could infer that Gavin was liable for failing to intervene because when he arrived, Mollette was employing force and using an unauthorized PRT.

Here, Myers testified that he arrived on the scene prior to Stephens' attempt to restrain plaintiff.  Plaintiff testified that he was in a choke hold for five seconds, standing with his arms behind him for another ten seconds before being thrown to the ground, and on the ground with Myers for 15 to 20 seconds before Myers took over.  Plaintiff also testified that after Myers took over the hold, Stephens remained next to them and stood about a foot or two away.   Stephens admitted that he was still present when plaintiff's arm broke and testified that he was standing for ten to twelve seconds before he heard "the pop".  As the Court previously held, whether defendants used excessive force is an issue of fact for the jury.  Assuming the facts in a light most favorable to plaintiff, a jury could conclude that both defendants were standing close enough to each other and both had an opportunity to intervene and failed to do so.  Accordingly, defendants' motion for summary judgment and dismissal of plaintiff's claims relating to failure to intervene is denied.

**E.      Qualified Immunity**

In the alternative, defendants move for summary judgment and dismissal of plaintiff's claims on the ground of qualified immunity.  Public officials enjoy qualified immunity from liability under § 1983 "so long as their conduct does not violate a clearly established statutory or constitutional right." *Richardson v. Selsky*, 5 F.3d 616, 621 (2d Cir.1993) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818-19 (1982)). The Second Circuit has held that "[a] right is clearly established if: (1) the law is defined with reasonable clarity; (2) the Supreme Court or the Second Circuit has recognized the right; and (3) 'a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful.'" *Luna v. Pico*, 356 F.3d 481, 490 (2d Cir.2004) (quoting *Anderson v. Recore*, 317 F.3d 194, 197 (2d Cir.2003)).

In determining whether qualified immunity applies, the Court may first consider whether "the facts alleged show the [defendant's] conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *modified by Pearson v. Callahan*, 555 U.S. 223 (2009) (holding that although "the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory"). If the plaintiff establishes that the violation of a constitutional right occurred, the court can examine "whether the right was clearly established ... in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201. "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Id*.

Having carefully considered the present record, the Court is not well-positioned at this early stage to dismiss plaintiff's claims on the basis of qualified immunity.  The Court finds that "[r]esolution of qualified immunity depends on the determination of certain factual questions that

cannot be answered at this stage of the litigation." *Denton v. McKee*, 332 F.Supp.2d 659, 666 (S.D.N.Y.2004).

## IV.    CONCLUSION

Accordingly, it is hereby

**ORDERED** that defendants' motion for summary judgment and dismissal of plaintiff's complaint (Dkt. No. 37) is **DENIED**, and it is further

**ORDERED** that a Settlement Conference is scheduled in this matter for December 19, 2011 at 11:00 A.M. in Albany.  The parties are directed to appear at that time and make submissions in advance of the conference as directed in this Court's Order Setting Settlement Conference.

**IT IS SO ORDERED.**

Dated: December 1, 2011
        Albany, New York

Mae A. D'Agostino
U.S. District Judge

24